# IN THE SUPREME COURT OF IOWA

No. 20–1032

Submitted February 16, 2021—Filed March 12, 2021

**INTEREST OF A.B.** and **I.B.,** Minor Children,

**Y.B.,** Mother,

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Mitchell County, Karen Kaufman Salic, District Associate Judge.

Mother seeks further review of a court of appeals decision affirming a juvenile court order terminating her parental rights to two children. **AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

William P. Baresel of Prichard Law Office, P.C., Charles City, for appellant.

Thomas J. Miller, Attorney General, Ellen Ransey-Kacena, Assistant Attorney General, and Mark L. Walk, County Attorney, Osage, for appellee.

**MANSFIELD, Justice.**

A mother challenges an order terminating her parental rights to two children, aged two and four. The children have been out of her care since October 2018. The termination petition was filed in November 2019, and the order terminating parental rights was entered in July 2020. Although the court of appeals affirmed the juvenile court's order, a dissent concluded that the COVID-19 pandemic had thwarted the mother's efforts to demonstrate that the children could be safely returned to her. We took this case on further review to consider whether this case was appropriately handled in light of the pandemic.

We conclude that it was. On our de novo review, we agree with the juvenile court that the mother had made only limited progress. The supervised visits that occurred both before and during the pandemic showed that the mother could not safely parent the children. Also, the juvenile court acted within its discretion in granting several postponements of the termination hearing but ultimately concluding that it needed to go forward telephonically, notwithstanding the mother's objections. Accordingly, we affirm the order of the juvenile court and the decision of the court of appeals.

**I. Facts and Procedural History.**

A.B. and I.B., aged two and four respectively at the time of the termination hearing, are the sons of Mother and Father, who are married to each other. In May 2018, when A.B. was a newborn infant, A.B. and I.B. were adjudicated children in need of assistance. Some of the concerns at that time were Father's domestic violence against Mother, Father's abuse of alcohol, and Mother's inability to supervise the children when they were with her. Mother moved to Mason City and the children

remained with Father in Osage. In July 2018, Mother attempted suicide through an overdose of pain medications.

In October 2018, law enforcement came to Father's home in Osage. Mother had been there, contrary to the court order in place. When Father dragged her out of the house, she threw a shovel through a window. The juvenile court concluded that both parents were violating the court order and could not be trusted to have the children with them. A.B. and I.B. were removed from Father's home and turned over to the custody of the department of human services (DHS) for placement with their adult cousin in Iowa Falls. The home was stable and met the children's needs. Father provided some financial support for the children.

At times in 2019, both Father and Mother appeared to be doing better. They went through couples counseling. Father underwent substance abuse treatment for alcohol. However, an attempted reconciliation was unsuccessful.

Meanwhile, Mother did not work or seek work, relying on support from her family out of state in addition to governmental benefits. Throughout the case, Mother did not have a driver's license or access to personal transportation. Mother complained of pain for which there was no significant physical diagnosis. She talked of returning to California for medical treatment, criticizing the adequacy of the care she was getting, although she was receiving care from the Mayo Clinic. Mother failed to attend numerous therapy sessions and declined to take her mental health medications. Mother's supervised visits with the children were reduced to one per week because she was not attending them consistently. The juvenile court noted in May 2019 that Mother "is entirely dependent on others to meet her needs."

At a September 2019 review hearing, the juvenile court noted,

> Overall, there has been progress, which needs to continue. However, given how far past the permanency guidelines we are, it is essential that we be to a point of reunification by the next hearing, otherwise there will be some difficult decisions with few options.

In October, Father and Mother separated again following verbal conflict. Father acknowledged being verbally abusive and resuming the use of alcohol "as a coping tool." Mother continued to display deficiencies in her parenting skills at the supervised visits. At a November review hearing, consistent with DHS's recommendation and after noting the services provided over the last year and a half, the juvenile court directed the county attorney to file a petition for termination of parental rights.

The petition for termination of the parental rights of Father and Mother was filed on November 22. A hearing was scheduled for February 6, 2020.

In the interim, Father and Mother announced their plans to get a divorce. Father remained employed full-time and worked on remodeling his house in the hope that the children would be returned to his care. Both parents continued therapy; they now had separate in-person supervised visits with A.B. and I.B. The family safety, risk, and permanency services (FSRP) provider felt that Father's visits went well but that Mother continued to need work on parenting. Mother would fail to change A.B.'s diapers, would leave one child behind while taking the other to a public bathroom, and had difficulty redirecting or gaining control over the children. Mother leased a one-bedroom apartment and signed up for vocational rehabilitation services. Nonetheless, in a January 28, 2020 report to the court, DHS recommended termination of both parents' rights.

On February 6, the juvenile court decided to continue the termination hearing for one month to March 5. Father had waited until the last minute to request counsel and, because of his income, did not qualify for court-appointed counsel. The continuance was needed to give Father time to retain counsel and have his counsel present.

In-person supervised visits continued. Mother continued to have problems with basic safety issues such as allowing I.B. to follow her out into the street, permitting A.B. to put a pepper packet in his mouth, and allowing the children to get onto tables and desks. Mother would be on the phone a lot during visits and had trouble controlling the children and remembering to change A.B.'s diapers. A February 10 FSRP report concluded that Father managed the boys well but Mother "struggled to provide supervision that would ensure even their most basic needs of safety without . . . supervisors intervening."

Additionally, on February 19, the placement of the children was changed from relative care to foster care, based on the relatives having become licensed foster parents in order to adopt the children. At the request of Father's recently retained counsel, who needed more time to prepare, the termination hearing was continued from March 5 to April 2.

Despite the outbreak of the COVID-19 pandemic, in-person supervised visits continued in March. Mother again had difficulty managing the children during the visits. A recurring issue was her inability to get A.B. and I.B. into a car safely. Meanwhile, Father progressed to unsupervised overnight weekend visits with unannounced drop-ins. Father's weekend time went well.

On March 30, DHS partially changed its recommendation. It proposed that Father be given an additional three months to continue to make progress, while it reiterated that Mother's parental rights should be

terminated. Mother moved to continue the April 2 hearing. It was rescheduled to May 28 as a telephonic hearing. In the order granting the continuance, the court indicated that DHS could gradually increase Father's unsupervised time with A.B. and I.B.

Because of COVID-19, Mother's visits from April 11 to May 4 with the children were by video. Father isolated as much as possible and was able to keep having the children overnight for in-person visits.

Prior to the May 28 hearing, Mother filed a motion for an interpreter.[1] The juvenile court denied the motion, expressing concern about the delays in the case and noting that "during the course of the Court's more than two years of involvement with this family, the Court has never previously been informed that Mother's ability to understand English was an issue." Mother then moved for reconsideration of the order denying an interpreter and for an in-person hearing, explaining that she was "able to understand English with the context she receives from . . . facial expressions and movements when she is in the court room."

The juvenile court held a telephonic hearing on May 28. At the conclusion, the court decided to reschedule the termination hearing for an in-person hearing on July 23, anticipating that COVID-related restrictions on in-person hearings would be lifted by then. The court reasoned that "fundamental fairness to [Mother] requires additional delay" until July, although "[t]his is unfortunate for the children since it delays permanency for them."

The record is incomplete as to how visits proceeded in late May and early June. On June 11, the FSRP provider did a home check. There was concern expressed about Father, A.B., and I.B. all having to share a

---

[1]Mother is a permanent resident of the United States who was born in South Korea.

bedroom due to the upstairs needing work. Father explained he was hesitant to make improvements when he was behind on payments and the bank was threatening foreclosure. Father agreed to prepare the upstairs bedroom for the boys.

On June 19, Mother had an in-person visit with A.B. and I.B. that did not go very well. Mother locked herself out of the apartment as the children were arriving. She then allowed A.B. to play with small beads and put them in his mouth. In a June 30 report, the FSRP worker continued to recommend supervised visitation only for Mother, indicating that she "continues to struggle with understanding the needs of [A.B.] and [I.B.] regarding supervision and development." An FSRP report questioned the suitability of Mother's one-bedroom apartment because of its size and because it was not in a neighborhood where the children could safely play outside.

The termination hearing for Mother went forward telephonically on July 23. Although an interpreter had been provided, Mother nonetheless objected and requested an in-person hearing. The court declined the request, noting there were ten parties on the phone call who would need to be in the courtroom in addition to the judge and court reporter. In its subsequent written ruling, the court elaborated,

> The number of people necessary for this proceeding exceeds the social distancing capacity of the Mitchell County courtroom. It would be inappropriate to exclude any of these participants from the hearing. Additionally, throughout the case, Mother has complained of significant medical concerns that would make her high risk category for coronavirus. This hearing has been continued multiple times and the children have been removed from Mother's care for well over two years. In balancing those concerns, it was determined that the hearing should proceed by teleconference.

The DHS worker testified that Mother had not made any noticeable progress over two years. In DHS's view, the children could not be safely

returned to Mother, nor would this be in the children's best interests. In summary, the DHS worker pointed to Mother's "inability to be able to meet her own needs[,] let alone the needs of her children."

Mother testified that she had secured her one-bedroom apartment and was receiving job training.[2] She also testified that she was receiving food and housing benefits and that she would move to a larger apartment in the same complex if the children were returned to her. She generally downplayed her physical difficulties and offered explanations for some of the incidents in the FSRP reports.

At the conclusion of the hearing, the guardian ad litem was asked for his position on termination. He stated, "[M]y current position is that I would agree with [DHS's] recommendation, although I do have some reservations. I think mother may have some extenuating circumstances."

On July 28, the juvenile court filed an order granting the petition for termination of parental rights. The court explained,

> [O]ver the course of the last 28 months, [Mother] has made little . . . effort to obtain or maintain employment, and has often insisted that she cannot be employed.
>
> Mother does have her own apartment again, but she has lost her housing multiple times over the course of the CINA due to her lack of independent financial support, and lives in a neighborhood that would not be safe for the children to play outside in. Mother seems unconcerned with those risks, and the [FSRP] worker notes that Mother "has not been enthusiastic about or willing to establish a routine for play and study." Particularly as the children grow older, they will require not only a routine and attention to varied play and learning, but their interests and needs will increase, requiring a higher level of investment than Mother has been []willing to provide to them as very young children.

The court did recognize the challenges posed by COVID-19:

---

[2]At times, Mother answered questions directly in English, sometimes expressing a preference for doing so.

> Counterbalancing issues are a number of concerning observations. Obviously, for a period of time during the pandemic, visits were done via video chat. This can be very challenging given the young ages of the children, but seems to have actually gone better than in person visits. This was probably helped [by] a lot of [the foster mother]'s prompting and the boys being extremely comfortable in the home they have lived in for so long. In person visits have seemed harder.

In summary, the court found clear and convincing evidence that the children could not be returned to Mother and that termination was appropriate under Iowa Code section 232.116(1)(*f*) as to I.B. and section 232.116(1)(*h*) as to A.B. As the court put it, "The children cannot wait indefinitely for the possibility that Mother will eventually be able to meet their needs." The court also found termination to be in the children's best interests under section 232.116(2) and that no exception under section 232.116(3) justified a different result.

Mother appealed, and we transferred the case to the court of appeals. A majority of the three-judge panel affirmed the juvenile court's termination order. However, one judge dissented, explaining as follows:

> Unfortunately, the COVID-19 pandemic prevented the mother from demonstrating her independent parenting skills on a sustained basis, with many visits being held by video. Because the mother made marked improvements in her compliance with department expectations notwithstanding the pandemic, I would conclude termination was not in the children's best interests and I would reverse the termination decision and remand for further proceedings.

We granted further review to consider whether termination of parental rights was appropriate under the circumstances, including the challenges posed by COVID-19.

## II. Standard of Review.

As we said recently,

> We review termination of parental rights proceedings de novo. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). While we are not bound by the juvenile court's factual findings, we

> accord them weight, especially in assessing witness credibility. *Id.* "[O]ur fundamental concern" on review "is the child's best interests." *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014).

*In re J.H.*, 952 N.W.2d 157, 166 (Iowa 2020).

### III. Analysis.

We will first consider whether the State established that termination of Mother's parental rights was appropriate under Iowa Code section 232.116. We will then turn to whether special circumstances justify a different result, based upon DHS's inability to hold in-person visitation or the juvenile court's inability to hold an in-person termination hearing.

**A. Did Termination Comply with the Statute?** The only disputed element under section 232.116(1)(*f*) and (*h*) was whether A.B. and I.B. could be returned to Mother's care at the time of the termination hearing. We agree with DHS, the guardian ad litem, and the juvenile court that they could not be. Although the Mother undoubtedly cares deeply about her two children, had difficulty managing them and keeping them safe even during the two- or three-hour supervised visitation sessions. In her last report before the hearing, the FSRP worker wrote, "[Mother] continues to struggle with understanding the needs of [A.B.] and [I.B.] regarding supervision and development."

During the nearly two years that I.B. and A.B. were out of her care, Mother made progress in dealing with her own needs, with the assistance of a crisis intervention center. Even then, she had still not secured regular employment, she lacked a driver's license, and had no access to a vehicle. She continued to report chronic pain and weakness, for which her medical providers found no objective basis. At the termination hearing, she claimed her physical condition had improved, but the juvenile court

correctly noted that she was still telling the FSRP worker during visitation that "her physical limitations were a barrier."

Most importantly, though, Mother had not really advanced as a parent. She had trouble engaging with the children, spent visitation time on the phone, and repeatedly overlooked basic safety precautions during those visits. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (upholding termination where "after a year of services, the parents were still not in a position to care for [the child] without ongoing DHS involvement").

"The 'legislature has established a limited time frame for parents to demonstrate their ability to be parents.'" *In re A.S.*, 906 N.W.2d at 474 (citation omitted) (quoting *In re J.E.*, 723 N.W.2d 793, 800 (Iowa 2006)). "These deadlines stem in large part from mandates in federal law." *In re Z.P.*, 948 N.W.2d 518, 524 (Iowa 2020) (per curiam). "Once the limitation period lapses, termination proceedings must be viewed with a sense of urgency." *In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) (en banc). Mother had received much more than the time allotted by the statute.

Mother objects that the juvenile court "decided to reward the abuser in this action" by terminating her rights and not his. Mother was, sadly, a victim of domestic abuse, but her argument oversimplifies the situation. Mother and Father separated for good in October 2019. After that, Father developed and demonstrated appropriate parenting skills and progressed past supervised visitation; Mother did not. The record does not indicate that Mother has ever cared for the children alone overnight. *See In re Z.P.*, 948 N.W.2d at 524 (noting the same point in a termination-of-parental-rights case). "[J]uvenile law is not a fault-based edifice like tort law." *Id.* at 523. "[T]he interests of the child take precedence over family reunification." *In re L.T.*, 924 N.W.2d 521, 529 (Iowa 2019).

Here, the best interests of the children support termination of Mother's parental rights. *See* Iowa Code § 232.116(2). At the time of the hearing, A.B. and I.B. had been out of the home for almost two years. They were doing well in their current environment; by contrast, during her supervised visits, Mother remained unable to manage them successfully or even interact with them much. Frequent intervention and prompting from the FSRP worker were needed. *See* Iowa Code § 232.116(2) (directing the court to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child"); *In re P.L.*, 778 N.W.2d 33, 40–41 (Iowa 2010) (discussing the best interests of the child test).

Lastly, we do not believe there are grounds to avoid termination under Iowa Code section 232.116(3). Mother argues that a bond exists between her and A.B. and I.B. *See* Iowa Code § 232.116(3)(*c*). It is undeniable that the children and Mother have feelings for each other. This is confirmed by the FSRP reports. Yet the existence of a bond is not enough. The law requires clear and convincing evidence that "termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." *Id.* That standard has not been met. *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (finding the section 232.116(3)(*c*) exception did not apply despite the existence of some bond where the children were young, had been out of the mother's care for almost two years, and had achieved stability out of the mother's home).

Mother also opposed termination because the children were in the care of a relative. But this exception can come into play only when a relative has "legal custody." Iowa Code § 232.116(3)(*a*). DHS had legal custody. *See, e.g., In re A.M.,* 843 N.W.2d at 103, 106, 113 (noting that

this section did not cover a situation where maternal grandparents were taking care of the child but DHS had legal custody).

**B. Did COVID-19 Adversely Affect Mother's Ability to Reunify?**

The court of appeals dissent voiced a concern that the COVID-19 pandemic had adversely affected Mother's prospects for reunification with A.B. and I.B. We do not believe that is so. The termination hearing had been originally scheduled to occur on February 6, 2020, *before* the pandemic struck Iowa. It was postponed to April 2 only because of Father's issues in retaining counsel. It was then postponed from April 2 to May 28 and from May 28 to July 23 at Mother's request. Finally, on July 23, despite Mother's request for a further postponement to allow for an in-person hearing, the juvenile court decided it could wait no longer and needed to go forward.

We believe the juvenile court's decision to go forward with a telephonic termination hearing on July 23 was within its discretion. On March 14, as the COVID-19 pandemic struck Iowa, we gave courts the option to conduct certain hearings by remote technology in lieu of continuing them. *See* Iowa Sup. Ct., *In the Matter of Ongoing Preparation for Coronavirus/COVID-19 Impact on Court Services* (Mar. 14, 2020) https://www.iowacourts.gov/collections/470/files/1049/embedDocument/ [https://perma.cc/4NXZ-LYVB]. When courthouses reopened to the public in the summer, strict protocols were put in place for in-person hearings. *See* Iowa Sup. Ct., *In the Matter of Resuming In Person Court Services During COVID-19* (July 9, 2020) https://www.iowacourts.gov/collections/526/files/1144/embedDocument/ [https://perma.cc/TN7D-

CMMD]. If the juvenile court did not believe compliance with those protocols was possible, it needed to explore other options.[3]

The juvenile court did not have to order a further continuance. In *In re A.H.*, 950 N.W.2d 27, 39–41 (Iowa Ct. App. 2020), our court of appeals issued a thorough, published opinion upholding a decision by the same juvenile judge who presided over this case to hold a telephonic hearing in a different termination case during the COVID-19 pandemic. We generally agree with the reasoning in that court of appeals decision. "[C]ontinuances may be detrimental to the best interests of children." *In re M.D.*, 921 N.W.2d 229, 233 (Iowa 2018).

We have indicated that "the process due in each case is flexible depending on the particular circumstances." *In re M.D.*, 921 N.W.2d 235. While we have held that even incarcerated parents have a right to testify and participate by telephone, *see id.*, we have never decided that a parent has an absolute right to an in-person hearing regardless of the circumstances. The transcript of the termination hearing indicates that Mother and her counsel were able to present her case forcefully.

Given the number of participants in this termination hearing, the space constraints at the Mitchell County Courthouse as determined by the juvenile court, the ongoing ravages of COVID-19, and the fact that the hearing had already been delayed repeatedly, we find that proceeding telephonically in this case was a proper exercise of discretion.

Having said that, we encourage juvenile courts to consider other alternatives to a purely telephonic termination hearing. These would include a hearing by video conference, or a hybrid hearing at which

---

[3]No one challenged the juvenile court's determination that "[t]he number of people necessary for this proceeding exceed[ed] the social distancing capacity of the Mitchell County courtroom."

parents and their counsel appear in person while at least some other participants appear remotely.

Additionally, we do not agree with the court of appeals dissent that "the COVID-19 pandemic prevented the mother from demonstrating her independent parenting skills on a sustained basis." Mother had nearly two years to demonstrate those skills, and never progressed past supervised visitation. Seemingly at every visit, there were documented instances of the FSRP provider needing to step in and assist Mother. Mother's inability to handle the children without help and guidance during the relatively brief supervised visits shows that she would not have been able to parent on her own.

It is true that for about two months starting in early April 2020, in-person supervised visits were suspended and replaced by video interactions. Obviously, the video conferences that occurred at that point were suboptimal, but even they revealed Mother's limitations. For example, in one April video session, Mother had to be admonished because she held up candy for A.B. and I.B. which they could not have because the children were not in her presence. During the video sessions, as during the in-person sessions, the FSRP provider frequently had to role-model appropriate parenting. We do not believe the pandemic tipped the scales in this case.

### IV. Conclusion.

For the foregoing reasons, we affirm the juvenile court's order terminating parental rights and the decision of the court of appeals.

**AFFIRMED.**